

**IT IS HEREBY ADJUDGED and DECREED that the below described is SO ORDERED.**

**Dated: December 13, 2022.**

_____
**CRAIG A. GARGOTTA**
**CHIEF UNITED STATES BANKRUPTCY JUDGE**

_____

**UNITED STATES BANKRUPTCY COURT**
**WESTERN DISTRICT OF TEXAS**
**SAN ANTONIO DIVISION**

| | | |
|---|---|---|
| IN RE: | § | |
| | § | **CASE NO. 22-50591-CAG** |
| **CHRIS PETTIT & ASSOCIATES, P.C.** | § | |
| **AND CHRISTOPHER JOHN PETTIT,** | § | |
| | § | **(JOINTLY ADMINISTERED)** |
| | § | |
| **DEBTORS** | § | **CHAPTER 11** |
| | § | |

**ORDER DENYING FIRST AND FINAL APPLICATIONS FOR COMPENSATION AND EXPENSES OF MARTIN & DROUGHT, P.C. AND DISGORGING AMOUNTS PAID TO MARTIN & DROUGHT, P.C.**

Came on for consideration two fee applications filed by Martin & Drought, P.C. ("M&D") for its representation of jointly administered Debtors Christopher John Pettit and Chris Pettit & Associates, P.C ("CP&A"). M&D filed its First and Final Application for Compensation of Fees and Expenses of Martin & Drought, P.C. within the Chris Pettit & Associates, P.C. Chapter 11

1

Case ("CP&A Fee Application") in case number 22-50591, the lead case.[1] (CP&A ECF No. 468). M&D similarly filed its First and Final Application for Compensation of Fees and Expenses of Martin & Drought, P.C. within the Christopher John Pettit Chapter 11 Case ("CP Fee Application") in case number 22-50592.[2] (CP ECF No. 91). M&D filed both the CP&A Fee Application and the CP Fee Application (collectively, the "Fee Applications") on September 27, 2022.

Both Fee Applications drew objections from the United States Trustee ("UST") (CP&A ECF No. 535; CP ECF No. 102)[3] and the Chapter 11 Trustee ("Trustee") (CP&A ECF No. 539; CP ECF No. 104).[4] The Noltes, parties in interest, filed objections and joined the objection filed by the UST. (CP&A ECF No. 608; CP ECF Nos. 103, 120).  All objections ask the Court to deny the fees requested in the Fee Applications. Because the Court finds that M&D's disclosures in both cases were incomplete and inadequate, the Court DENIES the Fee Applications and DISGORGES all amounts received by M&D to the Chapter 11 Trustee to be held for the benefit of the creditors.

**JURISDICTION**

As a preliminary matter, the Court has jurisdiction over this matter pursuant to 28 U.S.C. § 1334. This is a core proceeding under 28 U.S.C. §§ 157(b)(2)(A) and (B). Venue is proper under 28 U.S.C. §§ 1408 and 1409. This case is referred to this Court by the Standing Order of Reference entered in this District.

---

[1] ECF denotes electronic filing number. All references to the docket in the lead case, 22-50591, will read CP&A ECF No. ___. In text references will call case number 22-50591 the CP&A case or lead case.

[2] ECF denotes electronic filing number. All references to the docket in case number 22-50592 will read CP ECF No. ___. In text references will call case number 22-50592 the Pettit case.

[3] Where UST's objections ("UST's Objections") advance the same (or substantially the same) argument, the Court will refer to the UST's objection in the lead case, case number 22-50591.

[4] Where the Trustee's objections ("Trustee's Objections") advance the same (or substantially the same) argument, the Court will refer to the Trustee's objection in the lead case, case number 22-50591.

## FACTUAL AND PROCEDURAL HISTORY

**Pre-Filing Background**

Before voluntarily filing for bankruptcy on behalf of himself and his law firm, Christopher John Pettit practiced law in San Antonio, Texas. Pettit, individually or through CP&A, represented clients as an attorney, tax advisor and preparer, financial advisor, 1031 exchange intermediary, and served as trustee for various trusts. Pettit and CP&A's practice included estate planning, tax return preparation and tax filing, creation of trusts and estate plans, personal injury, probate, family law, and other matters.

Beginning in March 2022, various state court lawsuits named Pettit and CP&A as defendants. (*See, e.g.* Trustee's Exs. 19, 21, and 23). Plaintiffs in these suits were former clients of Pettit and/or CP&A. (*Id.*). The former clients alleged causes of action including breach of fiduciary duty, conversion, fraud, felony theft, fraudulent inducement, and unjust enrichment. (*Id.*). Gerald T. Drought—a named partner at M&D—defended Pettit and CP&A in the state court actions. (*Id.*). Pettit and CP&A, jointly and severally, signed agreed judgments in (at least some of) the state court actions brought by former clients. (*See, e.g.* Trustee's Exs. 20, 22, and 24). Drought also signed the agreed judgments as attorney for Pettit and CP&A. (Trustee's Exs. 22 and 24). The agreed judgments submitted as evidence on this matter exceed $35 million. (Trustee's Exs. 20, 22, and 24). These agreed judgments are respectively dated March 18, April 5, and May 27. (*Id.*). Plaintiffs in the May 27 agreed judgment are Frank and Emma Persyn Family Limited Partnership, Henry J. Persyn, Frank G. Persyn, Jr., Laura Kubesh, and Leslie Ann Persyn. (Trustee's Ex. 24).

**Early Bankruptcy Litigation**

On May 10, M&D, by and through attorney Michael G. Colvard, began advising Pettit and CP&A regarding bankruptcy. (CP&A ECF No. 468, at ¶ 1.8; CP ECF No. 91, at ¶ 1.8). Debtors filed separate, voluntary petitions for Chapter 11 bankruptcy relief on June 1. (CP&A ECF No. 1; CP ECF No. 1). Colvard was the attorney of record in both cases at the time of filing.

No more than two days later, Sharon Brimhall—another former client—filed a motion to appoint a Chapter 11 Trustee on June 3. (CP&A ECF No. 11; CP ECF No. 13). Brimhall alleged that "Pettit and CP&A have absconded with estate assets which were deposited with them in a fiduciary capacity" and that "Pettit and CP&A were defendants in at least 12 separate lawsuits in which the plaintiffs [sic.] are alleging that Pettit and CP&A have stolen funds in trusted to them." (CP&A ECF No. 11, at ¶¶ 5,7). Brimhall then referenced agreed judgments in the cases. (*Id.* at ¶ 7). Brimhall argued that cause existed to appoint a trustee because "[b]oth Pettit and CP&A engaged in a pattern of fraud, dishonesty, incompetence, or gross mismanagement of their affairs before the commencement of the case." (*Id.* at ¶ 10). At the hearing on the motion to appoint a trustee, counsel for Brimhall informed the Court that Brimhall and several other creditors were in the process of filing an involuntary petition on behalf of Debtors before Debtors voluntarily filed. (Hearing Audio, June 8, 2022 at 2:14 p.m.). At the hearing, Colvard told the Court that

> considering the status of the pending litigation and matters that were before Mr. Pettit, we considered that bankruptcy was the one forum where everything could be brought to a head, where the assets could be liquidated, claims could be resolved, and there could be a resolution in terms of distribution to the creditors.

(*Id.* at 2:35–36 p.m.). Colvard also advised the Court that Pettit intended to waive his discharge. (*Id.* at 2:37 p.m.). Debtors did not oppose the appointment of a trustee. The Court approved the appointment of a trustee at the hearing and issued the appropriate orders thereafter. (CP&A ECF

4

No. 13; CP ECF No. 14). Ultimately, the Court approved Eric Terry's appointment as Chapter 11 Trustee on June 22. (CP&A ECF No. 83).

At the same hearing, the Court considered Debtor's Emergency Motion for Order Authorizing Joint Administration pursuant to Bankruptcy Rule 1015 and Local Rule 1015. (CP&A ECF No. 9; CP ECF No. 11). The Court also approved joint administration and entered its Order Granting Motion for Joint Administration on June 21, designating 22-50591 as the lead case. (CP&A ECF No. 78; CP ECF No. 44).

On July 6, the UST filed a Notice of Appointment of Committee of Unsecured Creditors. (CP&A ECF No. 148). The Frank and Emma Persyn Family Limited Partnership is a member of the Unsecured Creditors Committee. (*Id.*).

## Disclosures in *In re CP&A*

On the second day of CP&A's bankruptcy, CP&A submitted its Application of Debtor to Employ Counsel ("CP&A Application to Employ") (CP&A ECF No. 7).[5] The CP&A Application to Employ asked the Court to approve employment of M&D, with Colvard as lead counsel, as Debtor's counsel. Attached as Exhibit 1 was an Affidavit of Disinterest, sworn by Colvard. (CP&A ECF No. 7, Ex. 1). The affidavit states that "[M&D] will seek compensation in this case at the hourly rates normally charged by [M&D]." (*Id.* at 2). For Colvard, that rate is $500 per hour. (*Id.*). The Affidavit of Disinterest also states:

> [M&D] provided pre-bankruptcy legal services to Debtor unrelated to bankruptcy preparation or planning, principally focusing on state court proceedings and settlement prospects of creditor efforts, seeking debt recovery. [M&D] received compensation for those pre-bankruptcy state court related proceedings and was not owed any pre-petition fees or expenses in relation thereto. [M&D] received separate retainers for bankruptcy related services to be used in the planning, counseling, review of matters and for the pre-bankruptcy legal services unrelated to state court proceedings. The prepetition bankruptcy retainers were partially consumed in satisfaction of legal services provided for planning, preparation and filing the

[5] The CP&A Application to Employ was admitted as M&D's Ex. 6, Trustee's Ex. 7, and UST's Ex. 5.

bankruptcy petition. No [M&D] pre-petition [sic.] were outstanding on the filing date.

(*Id.*). The Affidavit of Disinterest also states M&D "represents no interest adverse to this Debtor's estate, holds no interest adverse to Debtor's estate, and is a disinterested party within this proceeding." (*Id.* at 1).

No party in interest objected to M&D's employment as CP&A's counsel. The Court granted the CP&A Application to Employ on June 27. (CP&A ECF No. 128).

On June 30, CP&A filed its first set of Schedules and Statement of Financial Affairs ("June 30 Schedules", "June 30 SOFA", or "June 30 Schedules and SOFA") (CP&A ECF No. 136).[6] The June 30 SOFA Part 2, Question 3 instructs CP&A to "[l]ist payments or transfers—including expense reimbursements—to any creditor, other than regular employee compensation, within 90 days before filing this case unless the aggregate value of all property transferred to that creditor is less than $7,585." (CP&A ECF No. 136, at 113). CP&A admitted it made payments or transferred property to "[v]arious [c]reditors." (*Id.*). Instead of listing dates, CP&A stated "[a]n accounting of payments made within 90 days is being prepared, but comprehensive information is not currently available and will be supplemented upon completion of the accounting, to be provided as amendment to SOA 2.3 as soon as available." (*Id.*). CP&A did not list M&D in response to Part 2, Question 3 on the June 30 SOFA.

Part 6, Question 11 of the June 30 SOFA prompts CP&A to

List any payments of money or other transfers of property made by the debtor or person acting on behalf of the debtor within 1 year before the filing of this case to another person or entity, including attorneys, that the debtor consulted about debt consolidation or restructuring, seeking bankruptcy relief, or filing a bankruptcy case.

---

[6] The June 30 Schedules and SOFA were admitted as M&D's Ex. 12, Trustee's Ex. 2, and UST's Ex. 4.

(*Id.* at 117). CP&A listed a May 16, 2022 payment to M&D for $20,000 with the description "Retainer – Bankruptcy for Chris Pettit & Associates." (*Id.*).

Included with the June 30 Schedules and SOFA is a Disclosure of Compensation of Attorney for Debtor ("June 30 Disclosure of Compensation") pursuant to Federal Rule of Bankruptcy Procedure ("Rule(s)") 2016(b). Colvard answered Question 1 as follows:

> Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:
>
> For legal services, I have agreed to accept ……………………..………. $20,000.00
>
> Prior to the filing of this statement I have received …………………… $20,000.00
>
> Balance Due …………………………………………………………………. $0.00

(*Id.* at 138). As to Question 2, Colvard checked the "other" box as the source of his compensation. Because selecting other requires debtor's counsel to specify, Colvard identified "Chris Pettit" as the source of his compensation. (*Id.*).

## Disclosures in *In re Pettit*

Unlike in the CP&A case, Pettit filed his first set of Schedules and Statement of Financial Affairs ("June 1 Schedules", "June 1 SOFA", or "June 1 Schedules and SOFA") along with his voluntary petition on June 1. (CP ECF No. 1).[7] Part 3, Question 6 of the June 30 SOFA asks if Pettit, during the 90 days before filing for bankruptcy, paid any creditor a total of more than $600. (*Id.* at 149). Pettit checked the "yes" box and listed payments to 19 creditors within the 90-day lookback period. (*Id.* at 149–52). Pettit did not list payment to M&D. (*Id.*).

---

[7] The June 1 Schedules and SOFA were admitted as M&D's Ex. 9, Trustee's Ex. 4, and UST's Ex. 1.

Part 7 of the June 1 SOFA asks about payments within one year of filing for bankruptcy. Question 16 asks if Pettit, within one year of filing bankruptcy, or anyone else acting on Pettit's behalf paid or transferred any property to anyone Pettit consulted about seeking bankruptcy or preparing a bankruptcy petition. (*Id.* at 157). Pettit listed two payments to M&D: one on May 16 for $10,000 and a second on May 25 for $50,000. (*Id.*). Similarly, Question 17 asks Pettit whether, within one year of filing for bankruptcy, he or anyone else acting on his behalf paid or transferred any property to anyone who promised to help Pettit deal with his creditors or to make payments to his creditors. (*Id.*). The question instructs Pettit to "not include any payment . . . listed on line 16." (*Id.*). Pettit answered no. (*Id.*).

Included with the June 1 Schedules and SOFA is a Disclosure of Compensation of Attorney for Debtor ("June 1 Disclosure of Compensation") pursuant to Rule 2016(b). Colvard answered Question 1 as follows:

> Pursuant to 11 U.S.C. § 329(a) and Fed. Bankr. P. 2016(b), I certify that I am the attorney for the above named debtor(s) and that compensation paid to me within one year before the filing of the petition in bankruptcy, or agreed to be paid to me, for services rendered or to be rendered on behalf of the debtor(s) in contemplation of or in connection with the bankruptcy case is as follows:
>
> For legal services, I have agreed to accept ………………………..………. $40,000.00
>
> Prior to the filing of this statement I have received …………………… $40,000.00
>
> Balance Due ……………………………………………………………………. $0.00

(*Id.* at 178). As to Question 2, Colvard checked the "debtor" box as the source of his compensation, thereby identifying Pettit. (*Id.*).

The next day, on June 2, Pettit filed his Application of the Debtor to Employ Counsel ("Pettit Application to Employ") (CP ECF No. 10).[8] Other than the caption, the Affidavit of

---

[8] The Pettit Application to Employ was admitted as M&D's Ex. 5, Trustee's Ex. 10, and UST's Ex. 2.

Disinterest attached to the Pettit Application to Employ is identical to the same attached to the CP&A Application to Employ. (*Compare* CP ECF No. 10, Ex. 1 *with* CP&A ECF No. 7, Ex. 1). Attached as Exhibit 1, the affidavit states that "[M&D] will seek compensation in this case at the hourly rates normally charged by [M&D]." (CP ECF No. 10, Ex. 1, at 2). For Colvard, that rate is $500 per hour. (*Id.*). The Affidavit of Disinterest also states:

> [M&D] provided pre-bankruptcy legal services to Debtor unrelated to bankruptcy preparation or planning, principally focusing on state court proceedings and settlement prospects of creditor efforts, seeking debt recovery. [M&D] received compensation for those pre-bankruptcy state court related proceedings and was not owed any pre-petition fees or expenses in relation thereto. [M&D] received separate retainers for bankruptcy related services to be used in the planning, counseling, review of matters and for the pre-bankruptcy legal services unrelated to state court proceedings. The prepetition bankruptcy retainers were partially consumed in satisfaction of legal services provided for planning, preparation and filing the bankruptcy petition. No [M&D] pre-petition [sic.] were outstanding on the filing date.

(*Id.*). The Affidavit of Disinterest also states M&D "represents no interest adverse to this Debtor's estate, holds no interest adverse to Debtor's estate, and is a disinterested party within this proceeding." (*Id.* at 1).

On July 19, Pettit amended his Schedules A, B, C, D, G, and his SOFA ("July 19 Schedules", "July 19 SOFA", or "July 19 Schedules and SOFA") (CP ECF No. 59).[9] Pettit answered Part 7, Question 17 differently in the July 19 SOFA than in the June 1 SOFA. (*Compare* CP ECF No. 59, at 42 *with* CP ECF No. 1, at 157). In his amendment, Pettit answered "yes" when asked if, within one year before filing for bankruptcy, he or anyone else acting on his behalf paid or transferred any property to anyone who promised to help Pettit deal with his creditors or to make payments to his creditors. (CP ECF No. 59, at 42). Specifically, Pettit listed payments between March 17 and May 13, 2022 to M&D in the amount of $70,000 for "Payment of Legal

---

[9] The July 19 Schedules and SOFA were admitted as M&D's Ex. 10, Trustee's Ex. 5, and UST's Ex. 3.

Fees in relation [sic.] to representation within several State Court Cases between March – June 2022." (*Id.*).

**UST Complains regarding Disclosures of Compensation**

The UST and Colvard met on July 13. At the meeting, the UST and his representative informed Colvard that the UST considered his disclosures of compensation inadequate because it did not clearly state the fee structure and the nature of the Applicant's prepetition compensation.

**Revelation of IOLTA Payments to M&D and M&D's Withdrawal as Counsel**

On August 4, the Court held a hearing regarding whether the Court should authorize a budget for Pettit's living expenses because he had no access to cash and no job. The Court denied Pettit's request for any spending money. (*See* CP&A ECF No. 293). During the August 4 hearing, counsel for creditors Verstuyfts and Seiferts put on evidence of bank statements from an IOLTA account[10] ("NM IOLTA") Pettit controlled. The exhibit showed that M&D received funds from the NM IOLTA account. Thereafter, on August 10, party in interest Beyer Living Trust sent M&D a demand letter. (*See* CP&A ECF No. 332, at 3).

Then, on August 23, M&D filed its Motion of Martin & Drought P.C. for Authority to Withdraw as Joint Debtors' Counsel ("Motion to Withdraw") (ECF No. 330).[11] Several parties opposed M&D's withdrawal as counsel at a contested hearing on August 29. The Court granted the Motion to Withdraw over the objections.

Contemporaneously with the Motion to Withdraw, M&D filed a Supplement to Affidavit of Disinterest under Bankruptcy Rule 2016(b) ("Supplemental Affidavit of Disinterest") (CP&A

---

[10] IOLTA stands for Interest on Lawyers' Trust Accounts. When a lawyer handles money that belongs to clients, the lawyer is to deposit the money into an IOLTA account. This serves to segregate the client's money from the lawyer's or law firm's use. Deposit into an IOLTA account also allows the funds to earn interest for the client. Comm'n on Int. Laws.' Tr. Accts., *IOLTA: Overview*, AM. BAR ASS'N, https://www.americanbar.org/groups/interest_lawyers_trust_accounts/overview/.

[11] The Motion to Withdraw was admitted as M&D's Ex. 15, Trustee's Ex. 12, and UST's Ex. 7.

ECF No. 332)[12] on August 23. In summary form, the Supplemental Affidavit of Disinterest states M&D had no knowledge "that retainer funds paid to [M&D] by Christopher Pettit or CP&A were derived from the Wells Fargo NM IOLTA, or that funds used to pay [M&D] retainers may have originated from CP&A client funds" prior to the revelations at the August 4 hearing. (CP&A ECF No. 332, at 2). Since the August 4 hearing, M&D reviewed the wire transfers it received for representing Pettit and CP&A (both in state court and bankruptcy court), the April 2022 NM IOLTA statement introduced at the hearing, and the May 2022 NM IOLTA statement, provided to M&D by the Trustee. (*Id.* at 1). Reviewing the May 2022 NM IOLTA statement revealed two more transfers to M&D: one on May 11 for $40,000, and a second on May 16 for $10,000. (*Id.* at 1–2).

M&D next stated it received a total of five wire transfers for its representation of Pettit and CP&A, both in the state court matters and bankruptcy: $10,000 on March 10; $20,000 on April 13; $40,000 on May 11; $10,000 on May 16; and $50,000 on May 25. (*Id.* at 2). The first three transfers, totaling $70,000, "were intended as payments / retainers for prepetition attorney services in relation to pending State Court matters for which [M&D] became employed in March 2022." (*Id.*). The remaining two transfers totaling $60,000 "were received as bankruptcy retainer / payments intended to compensate for [M&D] bankruptcy related services." (*Id.*). M&D states that the "prepetition bankruptcy retainers were partially consumed in satisfaction of legal services provided by [M&D]". (*Id.* at 4).

M&D then made the following disclosure:

A review of the Wells Fargo NM IOLTA bank statements for April and May 2022, without further documentation, does not provide conclusive information or certainty regarding the source of funds or the originating accounts funding the [M&D] payments of:
    i. April 30, 2022 wire transfer of $20,000.00;

---

[12] The Supplemental Affidavit of Disinterest was admitted as M&D's Ex. 14, Trustee's Ex. 13, and UST's Ex. 6.

ii. March 30, 2022 wire transfer of $10,000.00; and,

iii. May 25, 2022 wire transfer of $50,000.00.

The wire transfer dated May 25, 2022, in the amount of $50,000.00 does not appear to have originated from the Wells Fargo NM IOLTA.

(*Id.* at 3). The Court observes that the paragraph purporting to list all "wire transfers as retainer deposits or payments from Debtors" to M&D does not list March 30 or April 30 payments. (*Compare id.* at 2 *with id.* at 3). Colvard testified at the hearing on this matter that M&D received five wire transfers totaling $130,000.

M&D next acknowledged that the May 11 wire transfer of $40,000 "appears to have originated from a deposit into the Wells Fargo NM IOLTA account on the same day, which deposit may constitute CP&A client funds." (*Id.* at 3). M&D states this is the money referenced in the Beyer Living Trust demand letter dated August 10. (*Id.*).

Lastly, M&D stated that, though it did not previously know, "M&D is now aware that transfers to [M&D] totaling $70,000.00, made by three separate wire transfers received on April 13, May 11, and May 16, 2022, were paid out of funds maintained within the Wells Fargo NM IOLTA Account, and that the $40,000.00 transfer on May 11, 2022 appears to have originated from CP&A client funds." (*Id.* at 4). M&D then states that "a lack of 'disinterest' under 11 U.S.C. § 327(a) may exist or may arise." (*Id.* at 4). M&D also acknowledges that receipt of funds subject to claims of third parties creates a conflict of interest between M&D, Pettit, CP&A, and/or the creditors asserting claims to the funds under Tex. Disciplinary R. Pro. Conduct 1.06(b)(1) and/or (2).

In summary form, M&D in its Supplemental Affidavit of Disinterest disclosed the following information regarding payments for representation of Pettit and CP&A, both in state court and bankruptcy:

| Date of Receipt | Amount | Source of Funds | Representation |
|---|---|---|---|
| March 10, 2022 | $10,000 | Unknown | State Court |
| March 30, 2022 | $10,000 | No information provided | No information provided |
| April 13, 2022 | $20,000 | NM IOLTA | State Court |
| April 30, 2022 | $20,000 | No information provided | No information provided |
| May 11, 2022 | $40,000 | NM IOLTA; demanded by Beyer Living Trust | State Court |
| May 16, 2022 | $10,000 | NM IOLTA | Bankruptcy |
| May 25, 2022 | $50,000 | Unknown; M&D contends likely not NM IOLTA | Bankruptcy |

(*See generally* CP&A ECF No. 332).

The Court has no direct evidence of the NM IOLTA statements, other than the April 2022 statement admitted during the August 4 hearing. The Court has no direct evidence of the wire transfers received by M&D. Rather, the only evidence before the Court is Colvard's testimony regarding his review of the wire transfers and NM IOLTA statements and these disclosures.

**The Fee Applications**

M&D filed its Fee Applications[13] on September 27, 2022. Both Fee Applications only seek compensation from June 1 through June 22: the period from the date of petition until the appointment of Eric Terry as Trustee. (CP&A ECF No. 468, at 1–2; CP ECF No. 91, at 1). The CP&A Application requests compensation in the amount of $28,200, reimbursement of expenses in the amount of $2,547.71, and fees and expenses associated with filing the CP&A Fee Application in the amount of $1,500, for a total award of $32,247.71. (CP&A ECF No. 468, at 1). The CP Fee Application requests compensation in the amount of $31,100, reimbursement of expenses in the amount of $1,910.69, and fees and expenses associated with filing the CP&A Fee

---

[13] The CP&A Fee Application was admitted as M&D's Ex. 2. Likewise, the CP Fee Application was admitted as M&D's Ex. 1.

Application in the amount of $1,500, for a total award of $34,410.68. (CP ECF No. 91, at 1). Both Fee Applications state that M&D received $60,000 as a prepetition retainer and allocated $40,000 to the Pettit case and $20,000 to the CP&A case. (CP&A ECF No. 468, at ¶ 1.1; CP ECF No. 91, at ¶ 1.1). Both Fee Applications also indicate that M&D incurred prepetition fees not sought in both cases: $5,100 in CP&A and $16,350 in Pettit. (CP&A ECF No. 468, at ¶ 1.8; CP ECF No. 91, at ¶ 1.8). Likewise, both Fee Applications state that M&D incurred fees after June 23 not sought in both cases, though the amounts are not specified. (CP&A ECF No. 468, at ¶ 1.8; CP ECF No. 91, at ¶ 1.8). Amounts sought in the Fee Applications are to be reduced by "any unused and available retainer funds to the extent not returned to the estate or former CP&A clients." (CP&A ECF No. 468, at 11; CP ECF No. 91, at 11).[14]

To support its requests, M&D argues in both Fee Applications that the factors set forth in *In re First Colonial Corp.* regarding compensation under 11 U.S.C. § 330 for professionals. *See* 554 F.2d 1291, 1298–99 (5th Cir. 1997). Attached to both Fee Applications is a Declaration of Counsel under Rule 2016, sworn by Colvard. (CP&A ECF No. 468, Ex. 1; CP ECF No. 91, Ex. 1). These sworn statements do not address any payments made to M&D by the Debtors. Rather, the sworn statements say that the contents of the Fee Applications are true and correct. (CP&A ECF No. 468, Ex. 1; CP ECF No. 91, Ex. 1). Lodestars and application summaries are also attached to both Fee Applications. (CP&A ECF No. 468, Ex. 2–3; CP ECF No. 91, Ex. 2–3).

Parties in interest had twenty-one days to object. Both Fee Applications drew objections from the UST (CP&A ECF No. 535; CP ECF No. 102) and the Trustee (CP&A ECF No. 539; CP

---

[14] The phrase "not returned to the estate or former CP&A clients" presumably refers to the Court's Order Granting Motion for Approval of Procedure for i) Turnover of Property to the Estate ii) for Determination of Interests in Property iii) For Other Relief ("Turnover Order") (CP&A ECF No. 540). The Turnover Order establishes procedures for the return of property to the estate received by third parties as professional retainer funds, for parties in interest to lay claim to those funds, and for judicial determination if the parties cannot agree. (*Id.*).

ECF No. 104). In the Pettit case, the Noltes objected and thereafter joined the objection filed by the UST. (CP ECF Nos. 103, 120). In the CP&A case, the Noltes also joined the objection filed by the UST. (CP&A ECF No. 608). Each objection asks the Court to deny M&D's fee requests, though each party does not advance the same argument.[15] M&D responded to none of the objections.

The Court set the Fee Application and their objections for hearing on November 9. The Court heard argument from M&D, the Trustee, the UST, and the Noltes. Colvard represented M&D. Newly-employed counsel for Pettit was present to protect Pettit's interests but did not take a position on the Fee Applications. The Court heard testimony from Colvard and Pettit and admitted documentary evidence from M&D, the Trustee, and the UST.[16] Thereafter, the Court took the matter under advisement.

**PARTIES' ARGUMENTS**

The UST's Objections focus on incomplete disclosure. (CP&A ECF No. 535, at ¶ 1). The UST contends that M&D did not completely disclose its connections with the Debtors, that it had received payment(s) for representing the Debtors prior to bankruptcy, and the source of those payment(s), as required by 11 U.S.C. § 329(a), Rule 2014, and Rule 2016(b). (*Id.*). The UST further argues that M&D did not timely supplement its disclosures. (*Id.*). Citing caselaw both within and beyond this circuit, the UST asks the Court to deny M&D's request for compensation. (*Id.*).

The Trustee's Objections request that the Fee Applications should not be allowed on a final basis, as the Trustee has not determined whether to pursue potential claims against M&D. (CP&A

---

[15] The UST does not oppose M&D's request for out-of-pocket expenses in either case. (CP&A ECF No. 525, at 8; CP ECF No. 102, at 9).

[16] The Noltes filed an Exhibit and Witness list (CP&A ECF No. 603; CP ECF No. 119) but moved no exhibits into evidence.

ECF No. 539, at ¶ 28).[17] The Trustee argues that M&D had actual knowledge of Pettit's professional misconduct based on the agreed judgments admitting to breach of fiduciary duty, fraud, fraudulent inducement, conversion, and unjust enrichment. (*Id.* at ¶ 19). According to the Trustee, this knowledge imposed upon M&D a duty to report Pettit to the State Bar of Texas pursuant to Tex. Disciplinary R. Pro. Conduct 8.03(a). (*Id.*). Instead of reporting Pettit, M&D agreed to represent the Debtors both in state court and bankruptcy and continued to accept payment without investigating the source of funds. (*Id.* at ¶ 20). Like the UST, the Trustee argues that M&D did not completely disclose its pre-petition payments for representing the Debtors or the nature of such payments. (*Id.* at ¶ 22–23). The Trustee stressed he still has not received a reconciliation statement from M&D regarding payment for state court and bankruptcy representation of the Debtors, so the Trustee still has no understanding of what M&D was actually paid. (*Id.* at ¶ 23). Further, discussing the standard for compensating estate professionals, the Trustee states he "has serious concerns with respect to what value was actually provided to [the estates] by M&D during the Application Period given the continuous lack of disclosure regarding compensation" and ongoing issues with the Debtors' schedules, SOFAs, and creditor matrices. (*Id.* at ¶ 26; *see also* CP ECF No. 104, at ¶ 27). As such, the Trustee argues that M&D has not met its burden to be awarded "<u>any</u> amounts during the Application period given its lack of compliance with the Bankruptcy Code and Bankruptcy Rules." (CP&A ECF No. 539, at ¶ 26) (emphasis in original).

The Noltes joined the UST's Objections. (CP&A ECF No. 538; CP ECF No. 103). The Noltes supplemented their objection to argue that M&D engaged in "misconduct," which included neglect, filing multiple documents containing material misrepresentations, and filing incomplete

---

[17] In the alternative, the Trustee asks that "any order entered on the [Fee Applications] on a final basis [] provide any that any and all potential claims of the Trustee against M&D [be] reserved, preserved, and not affected in any form or fashion by such final approval of the [Fee Applications]." (CP&A ECF No. 539, at ¶ 28).

documents. (CP&A ECF No. 538, at ¶ 1). The Noltes allege M&D actually knew numerous filings had omissions and misrepresentations. (*Id.*). For these reasons, the Noltes ask for total denial of the Fee Applications. (*Id.* at ¶ 7).

M&D filed no response(s) to the objections. At the hearing, M&D argued that it believed it made forthcoming and complete disclosures based on the information available to it at the time and supplemented when new information came to light. As for the payments for state court representation, M&D argued that it did not disclose the payments because it did not believe disclosure was required under 11 U.S.C. § 329. To support this position, Colvard explained that M&D assigned separate matter numbers and maintained separate files for the state court and bankruptcy representations of the Debtors. With respect to the wire payments, Colvard stated that the wires received only indicated a Wells Fargo account as their source with no further specification, so he and M&D believed Pettit personally was the source of funds. M&D also noted that no party objected to its competence or rates. Therefore, M&D asked the Court to award the amounts requested in its Fee Applications.

**ANALYSIS**

Few matters before bankruptcy courts are as distasteful as the duty to examine transactions between a debtor and its attorney. The disagreeable nature of the task increases when the attorney is a prominent member of the bar. Colvard has practiced bankruptcy in this community for more than 42 years. Colvard has earned a reputation for highly competent and skilled representation as an expert in the field. The Court holds Colvard in high regard. Nevertheless, the Court must dispassionately evaluate fees requested by even the most respected attorneys when those fees are challenged.

Fulfilling this duty, though unpleasant, is also one of the most integral parts of the bankruptcy system. In the words of the United States Bankruptcy Court for the Eastern District of Pennsylvania:

> One of the surest means for the bankruptcy system to come under public disrepute is for the perception to take hold that it allows attorneys to milk the last cent out of debtors while leaving creditors nothing. Also disturbing is the prospect that attorneys may be able to extract a premium from debtors who are desperate to file in order to save an asset that is on the brink of being lost. These concerns, among others, have led Congress and the Courts to enact and enforce strict regulations on the payment of attorney's fees in bankruptcy. One of the cornerstones of the regulatory structure is the necessity for attorneys to fully and honestly disclose their transactions with clients. This disclosure requirement is embodied in 11 U.S.C. § 329(a) and implemented through Bankruptcy Rule 2016(b).

*In re Levin*, 1998 WL 732878, *2 (Bankr. E.D. Pa., Oct. 15, 1998). The Court, therefore, undertakes its review of the Fee Applications keeping in mind the importance of public confidence in the bankruptcy system.

## I.  Strict Standards of Disclosure

Debtors' transactions with attorneys are governed by 11 U.S.C. § 329, which provides:

(a) Any attorney representing a debtor in a case under this title, or in connection with such a case, whether or not such attorney applies for compensation under this title, shall file with the court a statement of the compensation paid or agreed to be paid, if such payment or agreement was made after one year before the date of the filing of the petition, for services rendered or to be rendered in contemplation of or in connection with the case by such attorney, and the source of such compensation.

(b) If such compensation exceeds the reasonable value of any such services, the court may cancel any such agreement, or order the return of any such payment, to the extent excessive, to—
    (1) the estate, if the property transferred—
        (A) would have been property of the estate; or
        (B) was to be paid by or on behalf of the debtor under a plan under chapter 11, 12, or 13 of this title; or
    (2) the entity that made such payment.

In other words, debtors' attorneys are required to report to the Court all compensation paid or agreed to be paid for services rendered "in contemplation of or in connection with" the case, if such payment or agreement as made within a year of filing for bankruptcy.

Section 329 is buttressed by Rule 2016(b). Rule 2016(b) requires that

> [e]very attorney for a debtor, whether or not the attorney applies for compensation, shall file and transmit to the United States trustee within 14 days after the order for relief, or at another time as the court may direct, the statement required by § 329 of the Code including whether the attorney has shared or agreed to share the compensation with any other entity. The statement shall include the particulars of any such sharing or agreement to share by the attorney, but the details of any agreement for the sharing of the compensation with a member or regular associate of the attorney's law firm shall not be required. A supplemental statement shall be filed and transmitted to the United States trustee within 14 days after any payment or agreement not previously disclosed.

In additional to the requirements in Section 329, Rule 2016(b) sets a 14-day time limit. Fed. R. Bankr. P. 2016(b). First, any Section 329 statement regarding compensation must be made within 14 days after filing bankruptcy. *Id.* Second, attorneys must file supplemental statements within 14 days after any payment or agreement not previously disclosed. *Id.*

The Bankruptcy Code and Rules authorize Courts to inspect these transactions and undo them. Under Section 329(b), if the "compensation exceeds the reasonable value of any such services," the court may disgorge such payment. 11 U.S.C. § 329(b); *see also* **Matter of Prudhomme,** 43 F.3d 1000, 1002 (5th Cir. 1995). Rule 2017 complements Section 329(b). Rule 2017(a) provides

> [o]n motion by any party in interest or on the court's own initiative, the court after notice and a hearing may determine whether any payment of money or any transfer of property by the debtor, made directly or indirectly and in contemplation of the filing of a petition under the Code by or against the debtor or before entry of the order for relief in an involuntary case, to an attorney for services rendered or to be rendered is excessive.

In other words, the enforcement provisions of Section 329(b) and Rule 2017(a) empower the Court "to act upon that disclosure by determining whether such payments were excessive and by ordering return of all or any part of such payments." ***In re Mayeaux***, 269 B.R. 614, 621 (Bankr. E.D. Tex. 2001).

This review process—along with the public confidence it instills in bankruptcy administration—is wholly dependent on complete and forthright compliance with the disclosure requirements by a debtor's attorney. ***Id.*** (quoting ***Arens v. Boughton***, 176 B.R. 781, 783 (W.D. La. 1993), *aff'd*, 43 F.3d 1000 (5th Cir. 1995) ("It is the duty of debtor's counsel to aid this review by providing the bankruptcy court with all information necessary to make an adequate review of the relevant transaction.")). The remedy for anything short of full disclosure is denial of compensation and disgorgement of sums already paid. ***Prudhomme***, 43 F.3d at 1003 (after discussing nondisclosure, holding "concealment [is] misconduct justifying disgorgement"). No exceptions are made for slipshodness or good faith. ***Matter of Kero-Sun, Inc.***, 58 B.R. 770, 780 (Bankr. D. Conn. 1986) (citing ***Gen. Motors Acceptance Corp. v. Undike (In re H. L. Stratton, Inc.)***, 51 F.2d 984, 987–88 (2d Cir. 1931)). This strict-liability principal is the law across the country. *See, e.g.* ***In re Downs***, 103 F.3d 472, 477 (6th Cir. 1996) (citing ***In re Chapel Gate Apartments, Ltd.***, 64 B.R. 569, 575 (Bankr. N.D. Tex. 1986); ***In re Inv. Bankers, Inc.***, 4 F.3d 1556, 1565 (10th Cir. 1993) (citations omitted); ***Futuronics Corp. v. Arrut (Matter of Futuronics Corp.)***, 655 F.2d 463, 469 (2d Cir. 1981)).

Here, all parties agree that M&D received compensation for representing the Debtors in the months before they filed for bankruptcy. Therefore, there are two issues regarding disclosure

of these amounts. [18] First is whether M&D was required to disclose such compensation. Second is whether any required disclosures were adequate.

### A. M&D was Required to Disclose Compensation Received for the State Court Representation

As explained above, section 329(a) requires debtors' attorneys to report all compensation paid or agreed to be paid for services rendered "in contemplation of or in connection with" the case. 11 U.S.C. § 329(a). Section 329(a) uses the disjunctive 'or,' meaning that "in contemplation of" and "in connection with" are distinct ideas. *Mayeaux*, 269 B.R. at 622 (citations omitted). Both must be reported. 11 U.S.C. § 329(a).

### 1. Payments "In Contemplation Of" Bankruptcy

Payment is made "in contemplation of" bankruptcy if the underlying professional services were rendered at time when the debtor was subjectively considering bankruptcy. *Mayeaux*, 269 B.R. at 622. As one court put it, the question is "whether, in making the transfer, the debtor is influenced by the possibility or imminence of a bankruptcy proceeding." *Wootton v. Ravkind (In re Dixon)*, 143 B.R. 671, 675 n.3 (Bankr. N.D. Tex. 1992).

Paying attorneys to avoid bankruptcy is "in contemplation of" bankruptcy. Interpreting the predecessor statute to section 329(a), the Supreme Court wrote:

> [I]t is insisted, in the instant case, that the payment to appellants could not properly be regarded as made in contemplation of bankruptcy, and hence within the jurisdiction to re-examine, because the payment was for the purpose of engaging appellants to conduct negotiations with creditors in order to arrange for an extension of time, and, if necessary, for the operation of the business under the creditors' supervision, and thus to avoid a forced liquidation and ultimately to restore the business to a sound basis. We find no ground for saying that the fact that such purposes were in view establishes, as matter of law, that the payment was not in contemplation of bankruptcy. *On the contrary, negotiations to prevent bankruptcy may demonstrate that the thought of bankruptcy was the impelling*

---

[18] No party disputes that the work Mr. Colvard personally performed is "in connection with" or "in contemplation of" the bankruptcies.

> *cause of the payment. A man is usually very much in contemplation of a result which he employs counsel to avoid.*

**Conrad, Rubin & Lesser v. Pender,** 289 U.S. 472, 478 (1933) (emphasis added) (citations omitted) (internal quotations omitted). Courts across the country maintain the Supreme Court's broad language from 1933 by finding payments for all sorts of legal work preceding bankruptcy subject to review. *See, e.g.* **Wootton,** 143 B.R. at 675 n.3 (compensation for representation in criminal litigation and related civil suits involving forfeiture while debtor was insolvent was "in contemplation of" bankruptcy); **Brown v. Luker (In re Zepecki),** 258 B.R. 719, 724–25 (8th Cir. B.A.P. 2001) (payment for attorney to conduct a sham 1031 exchange in order to remove assets from what would become the bankruptcy estate was "in contemplation of" bankruptcy).

Negotiating with or litigating against creditors is undoubtedly "in contemplation of" bankruptcy. The Fifth Circuit in **Prudhomme** held that debtors who hired an attorney to represent them in disputes with their largest creditor after they had been unsuccessful restricting debt made payments "in contemplation of" bankruptcy. **Prudhomme,** 43 F.3d at 1004. Other courts have reached similar results. *See* **In re Perrine,** 369 B.R. 571, 585 (Bankr. C.D. Cal. 2007) (finding real estate transfer to attorney 97 days prior to attorney, after exhausting efforts to litigate against largest creditor, for the stated purpose of "securing continued representation . . . in future litigation including without limitation, with creditors" was "in contemplation of" bankruptcy). Again, one contemplates bankruptcy by seeking to avoid it. **Conrad** 289 U.S. at 478.

Here, the payments made to M&D for representing the Debtors in state court litigation were "in contemplation of" bankruptcy, so they needed to be disclosed. On June 2, M&D stated in its Affidavits of Disinterest that

> [M&D] provided pre-bankruptcy legal services to Debtor unrelated to bankruptcy preparation or planning, principally focusing on state court proceedings and settlement prospects of creditor efforts, seeking debt recovery. [M&D] received

22

compensation for those pre-bankruptcy state court related proceedings and was not owed any pre-petition fees or expenses in relation thereto.

(CP&A ECF No. 7, Ex. 1, at 2; CP ECF No. 10, Ex. 1, at 2). The agreed judgments—which are based on allegations oft-repeated in this case, exceed $35 million, and were signed between 75 and four days before filing of bankruptcy—severely undermine M&D's contention that the services were unrelated to the bankruptcy. (*See* Trustee's Exs. 20, 22, and 24). Of particular importance to the Court's decision is the May 27 agreed judgment in favor of the Persyns. (Trustee's Ex. 24). The Debtors, by and through Drought of M&D, agreed to this judgment 17 days after the Debtors engaged Colvard of M&D for bankruptcy representation.

In other words, M&D admitted it had received compensation to litigate against "creditor efforts, seeking debt recovery" in state court. (CP&A ECF No. 7, Ex. 1, at 2; CP ECF No. 10, Ex. 1, at 2). M&D continued representation in litigation in debt recovery suits *for weeks after* it began bankruptcy representation. Unlike the numerous cases where other legal work predating bankruptcy was found to be "in contemplation of" bankruptcy, here, the litigation against at least one creditor resulting in a multimillion-dollar judgment was contemporaneous with the bankruptcy representation.

Though it is not evidence, Colvard's representations to the Court further support concluding the prepetition state court payments were "in contemplation of" bankruptcy. On the eighth day of these bankruptcies, Colvard told the Court that

> considering the status of the pending litigation and matters that were before Mr. Pettit, we considered that bankruptcy was the one forum where everything could be brought to a head, where the assets could be liquidated, claims could be resolved, and there could be a resolution in terms of distribution to the creditors.

(Hearing Audio, June 8, 2022 at 2:35–36 p.m.). Arguing now that the state court representation is unrelated to the bankruptcy strains credulity.

M&D accepted money for litigating against debt recovery efforts, continued to do so after beginning bankruptcy representation, and admitted to such representation in its earliest filings in these cases. These payments were "in contemplation of" bankruptcy.

## 2.  Payments "In Connection With" Bankruptcy

While "in connection with" inquiries employ a subjective standard, courts apply an objective standard when evaluating if legal services rendered by debtor's counsel were "in connection with" the bankruptcy case. *Mayeaux*, 269 B.R. at 623. If it can be objectively determined that the services had or will have an effect on the bankruptcy case, then such services are deemed to have been rendered in connection with the bankruptcy case and the attorney has a duty to disclose any compensation received or to be received for such services. *Id.* (citations omitted). Moreover, services which are the "precipitating cause" of bankruptcy are "in connection with" the bankruptcy. *In re Ostas*, 158 B.R. 312, 321 (N.D.N.Y. 1993) (citing *In re Command Servs. Corp.*, 85 B.R. 230, 232 (Bankr. N.D. N.Y. 1988)); *see also In re Laferriere*. 286 B.R. 520, 529 (Bankr. D. Vt. 2002) (prepetition legal "work had a direct impact on the ultimate filing of the Debtors' bankruptcy case.").

Though *Prudhomme* did not acknowledge the disjunctive nature of the phrases in section 329(a), the Fifth Circuit looked to objective factors. Those were: (1) the debtors' financial condition when first consulting their attorney; (2) the fact that the debtors were seeking representation to resolve disputes with their largest creditor; and (3) the fact that the debtors were unsuccessful in resolving such disputes in a non-bankruptcy context, thus leading to the bankruptcy filing. *Prudhomme*, 43 F.3d at 1004.

Again, *Prudhomme* places significant import on litigation and negotiation efforts, especially with creditors or regarding a business' affairs. *Id.* Other courts do as well. *Mayeaux*,

269 B.R. at 624–25 (negotiation and litigation efforts with largest unsecured creditor was "in connection with" bankruptcy, especially when Debtor's counsel conceded that the litigation was a primary reason for bankruptcy); *Laferriere*, 286 B.R. at 529 ("work related to defending two lawsuits brought by an unsecured creditor" were services "rendered in connection with" bankruptcy); *In re Rheuban*, 121 B.R. 368, 377 (Bankr. C.D. Cal. 1990) (connection with chapter 11 reorganization is "only reasonable inference" that can be drawn from firm's representation of debtor in criminal and civil matters regarding Debtor's business relationships "is directly related to the financial and business affairs" of debtor). Furthermore, legal work relating to asset that will become part of the estate is "in connection with" bankruptcy. *See In re Hill*, 5 B.R. 541, 542 (Bankr. C.D. Cal. 1980) ("Clearly, removal of judgment liens from the debtor's homestead is connected with the case.").

Here, the payments M&D received for its pre-petition non-bankruptcy representation of the Debtors were "in connection with" bankruptcy, so they needed to be disclosed. Allegations raised in state court provide the overarching theme of these bankruptcies. Nearly every dispute involves accusations that Pettit misappropriated money held in trust for his clients. The argument over M&D's fees is no exception: M&D received payments from Pettit's / CP&A's NM IOLTA account for legal work. The ever-repeated allegations which dominate argument in this case strongly militate toward finding the state court representation was in connection with the bankruptcies.

Claims of theft are not the only fact supporting this finding. M&D admitted it had received compensation to litigate against "creditor efforts, seeking debt recovery." (CP&A ECF No. 7, Ex. 1, at 2; CP ECF No. 10, Ex. 1, at 2). That litigation resulted in agreed judgments totaling more than $35 million. (Trustee's Exs. 20, 22, and 24). Three of those agreed judgments were entered

within 75 days of the bankruptcy. (*Id.*). Although it is not evidence, Colvard told the Court early on that the purpose of filing bankruptcy was to resolve all the creditor claims after the mounting litigation. (*See* Hearing Audio, June 8, 2022 at 2:35–36 p.m.).

Testimony elicited from Pettit demonstrates that M&D performed legal work beyond defending the Debtors in state court and representing the Debtors in bankruptcy. Pettit testified that Drought provided legal advice regarding the closing of what the Court colloquially calls the Sin Reposo transaction. (*See* Hearing Audio, November 9, at 4:40–41 p.m.). Pettit stated, and no party disputes, that he sold properties to Sin Reposo to fund the settlement with former client Dr. Ortiz. Sin Reposo's attorney prepared the real estate closing documents. (*Id.* at 4:41 p.m.). After asked by Colvard who specifically from M&D represented Pettit in the Sin Reposo transaction, Pettit replied "Mr. Drought was not involved in the closing, but he reviewed the legal documents." (*Id.* at 4:42 p.m.). Colvard then asked if Pettit was "actually represented in relation to the Sin Reposo transactions by someone other than [himself]?" (*Id.*). Pettit responded that he didn't "know how to answer that. Gerald Drought helped [him] review documents." (*Id.*). Pettit clarified that Drought helped him review the closing documents before the closing. (*Id.*). Pettit negotiated the transactions on his own. (*Id.* at 4:43 p.m.). Drought did not make any changes or modifications to the documents Sin Reposo's counsel prepared. (*Id.*). Though Pettit said he considered the Sin Reposo transaction a "done deal," Pettit also testified that he would have considered changes to the closing documents had Drought suggested any. (*Id.* at 4:43–45 p.m)

Reviewing real estate closing documents is providing legal advice. This remains true even if the attorney does not recommend changes. Not recommending changes is the attorney's professional opinion that the document as written serves the client's interests, just as much as suggesting alterations reflects the attorney's opinion that the document as written could better

26

serve the client's interests. The properties conveyed in the Sin Reposo transaction would have been property of Pettit's estate. By reviewing the closing documents, Drought performed legal work with respect to these assets, liquidated months before bankruptcy, to satisfy a settlement with former-client and now-judgment creditor Dr. Ortiz.

In summary form, for three months prior to bankruptcy, M&D provided legal services to Pettit and CP&A. These legal services were designed to negotiate with, litigate against, and satisfy settlements with former clients who accused Pettit of stealing multiple millions of dollars from them. No party disputes this. When the Debtors signed agreed judgments of roughly $35 million, M&D filed bankruptcy petitions for the Debtors. To say this prepetition representation was not objectively connected to these bankruptcies is suspect. M&D was therefore obligated to disclose payments it received for these services.

### 3. M&D did Not Adequately Disclose Payments for Work "In Contemplation Of" or "In Connection With" These Bankruptcies

The question, then, becomes whether M&D adequately disclosed the compensation it received for representing the Debtors before and during their bankruptcies. Debtors' attorneys have an obligation to provide the court with all information necessary to review adequately the transactions in question. *Mayeaux*, 269 B.R. at 621 (quoting *Arens*, 176 B.R. at 783, *aff'd*, 43 F.3d 1000 (5th Cir. 1995)). Counsel must disclose in the Rule 2016(b) statement the nature of his or her fee arrangement with the debtor; including further details regarding compensation in other filings is insufficient. *In re Smitty's Truck Stop*, 210 B.R. 844, 849 (10th Cir. B.A.P. 1997) (disgorgement ordered where applicant failed to disclose retainer in 2016 disclosure statement even though retainer was disclosed in SOFA) (citing *Prudhomme*, 43 F.3d at 1003). A contrary rule allowing piecemeal disclosure across filings "would nullify the § 329 and Rule 2016(b) disclosure requirements, which are designed to enable courts to oversee the fee arrangement

between debtor and its counsel. More importantly, it is not the court's job to search through the record to find all relevant facts relating to an attorney's employment." ***Smitty's Truck Stop***, 210 B.R. at 849 (citations omitted).

The Rule 2016(b) disclosure statement also requires counsel to disclose the source of funds paid for their services. Off. Bankr. Form B2030, question 2. An attorney must investigate the source of funds received where a reasonable lawyer would question the client. ***In re Parlex Assoc., Inc.***, 435 B.R. 195, 211–214 (Bankr. S.D. N.Y. 2010) (collecting cases and denying fees because attorney did not satisfy duty to investigate where a reasonable lawyer would suspect his retainer was paid from proceeds of fraudulent conveyance and attorney did not investigate); *see also **In re Grasso***, 586 B.R. 110, 146 (Bankr. E.D. Pa. 2018) ("[W]hen an attorney has reason to doubt his client, blind reliance ceases to be reasonable."). Failing to disclose to the source of funds is grounds for denial and disgorgement. ***Id.*** at 850 (denying fee application and disgorging money paid where Debtor's counsel did not truthfully disclose the source of funds paid to him until third relevant filing).

Disclosures must be complete, forthright, and easy to understand. *See **id.*** Concealment is unacceptable. ***Prudhomme***, 43 F.3d at 1003. "Negligent or inadvertent omissions do not vitiate the failure to disclose." ***In re Park-Helena Corp.***, 63 F.3d 877, 881 (9th Cir. 1995) (internal quotations omitted).

> Neither the Court, nor creditors or other parties-in-interest, should be forced to be detectives, clairvoyants, or soothsayers to figure out exactly what counsel's arrangement is with his clients (or other parties-in-interest) in a bankruptcy case. As one court aptly stated: 'Coy or incomplete disclosures which leave the court to ferret out pertinent information from other sources are not sufficient.'

***United States Tr. v. Cialella (In re Cialella)***, 643 B.R. 789, 819 (Bankr. W.D. Pa. 2022) (quoting ***In re Saturley***, 131 B.R. 509, 516 (Bankr.D.Me.1991)). If disclosures do not clear this high bar,

denial and disgorgement is the appropriate remedy. ***Prudhomme***, 43 F.3d at 1003. If the conduct is egregious, the court may also impose sanctions. ***Baker v. Cage (In re Whitley)***, 737 F.3d 980, 987 (5th Cir. 2013).

M&D's disclosures were unclear at best. Colvard's testimony suggesting M&D properly disclosed its bankruptcy retainers for each case required the Court to piece together bits of information across multiple documents. For example, M&D argued it disclosed in the June 1 Schedules receipt of two wire transfers in the amounts of $10,000 and $50,000. After reading the June 1 Disclosure of Compensation in Pettit June 30 Disclosure of Compensation in CP&A, the Court and parties in interest should have been able to surmise that M&D allocated $20,000 to CP&A and $40,000 to Pettit for their respective bankruptcy representation.

Further, M&D expected the Court and parties in interest to deduce these monies were retainers. M&D did state it received retainers for its bankruptcy work in the Pettit Application to Employ and CP&A Application to Employ, each filed on June 2. But M&D also made statements suggesting it received a flat fee. In the June 1 Disclosure of Compensation, M&D stated it had agreed to accept $40,000 and had already received $40,000, with no balance due, for representing Pettit. Similarly, in its June 30 Disclosure of Compensation, M&D told the Court it had agreed to accept $20,000 and had already received $20,000, with no balance due, for representing CP&A. The UST argued the way these disclosures of compensation are worded suggests M&D agreed to accept flat fees. The Court is inclined to agree. At the least, M&D could have worded the disclosures of compensation differently to clarify. M&D could have said it had agreed to accept an hourly rate, had already received a retainer (indicating its amount), and that balances due would accrue at the hourly rate once the retainer was exhausted. Using the word "retainer" would have better indicated the existence of a retainer.

More examples of inconsistent or confusing 'disclosures' exist in the record. The Court believes these examples illustrate the pattern of incomplete disclosure without expounding further. The Code and Rules require debtor's counsel to be clear about its financial relationship with the debtor. The burden does not lie with anyone else to figure out what that relationship is. M&D's proposition that the Court and parties in interest sift through the hundreds of pleadings in these cases to understand M&D's disclosures of compensation is unacceptable.

Moreover, one of the disclosures was mistaken at best, false at worst. M&D identified Pettit as the source of the $60,000 identified in the disclosures of compensation. Since those disclosures on June 1 and June 30, the record evidence shows Pettit diverted money from the NM IOLTA account held in trust for his clients to M&D. Colvard stated that the wire transfers to M&D only revealed that the transfers were from a Wells Fargo account, so M&D had no reason to believe the money came from a source other than Pettit. When cross-examined by the Trustee, Colvard admitted he did not review the wire information at the times of receipt. Rather, Colvard reviewed the wires between the August 4 revelation and preparing his Supplemental Affidavit of Disinterest. When cross-examined by the UST, Colvard stated he did nothing before filing his disclosures of compensation to investigate the source of funds other than talking with Pettit.

If ever there were a case where a reasonable lawyer should question the source of his client's funds, it is these cases. M&D knew former clients accused Pettit of using funds he held in trust for the clients "for his own benefit and purpose." (*See, e.g.* Trustee's Ex. 19, at ¶ 8; *see also* Trustee's Ex. 21, at ¶ 18 ("Pettit . . . stole all of the $908,148.87 [escrow funds] for his personal benefit and use."); Trustee's Ex. 21, at ¶ 19 ("Defendants willfully, fraudulent took or converted to their own use the Plaintiff's money, which Defendants acquired unlawfully and while in a position of trust.")). M&D signed agreed judgments on Debtors' behalf in response to these

allegations. (Trustee's Ex. 20, 22, and 24). Following these allegations, a lawyer has good reason to question whether the monies paid to him or her are client funds. Under the circumstances, M&D had a duty to investigate the source of funds. M&D did not. M&D unreasonably relied on Pettit's word instead. This unreasonable reliance resulted in providing false information to the Court.

Colvard testified he did not learn M&D received money from the IOLTA account until the August 4 hearing. M&D—by and through Colvard—did not file its Supplemental Affidavit of Disinterest revealing that retainer funds originated in the NM IOLTA until August 23. Accepting Colvard's testimony as true, Rule 2016(b) required a supplemental statement within 14 days, by August 18. M&D supplemented too late.

In addition to being late, the Supplemental Affidavit of Disinterest still leaves the Court with questions regarding M&D's compensation. The Court is unclear whether M&D received a total of five or seven wire transfers while representing the Debtors. The Supplemental Affidavit of Disinterest states M&D "received five prepetition wire transfers as retainer deposits or payments from Debtors." (CP&A ECF No. 332, at 2). M&D disclosed these wires were received on March 10, April 13, May 11, May 16, and May 25. (*Id.*). Close review of the document, however, reveals two other wire transfers on March 30 and April 30. (*Id.* at 3). Colvard testified the firm received five wires. Therefore, the Supplemental Affidavit of Disinterest is internally inconsistent and, at least to some degree, does not comport with Colvard's testimony. Perhaps the March 30 and April 30 wires are a typographical error. Even so, carelessness in face of such a demanding standard and after M&D drew intense scrutiny after August 4 is unacceptable.

Additionally, M&D still has not disclosed the source of some the funds it received. Specifically, M&D has not disclosed the source of funds for the March 10 and May 25 wires. M&D stated that the May 25 transfer "does not appear to have originated from the Wells Fargo

NM IOLTA," but the firm has yet to affirmatively disclose the source to the Court. (*Id.* at 3). If indeed M&D received wires on March 30 and April 30, all M&D has told the Court is that the NM IOLTA statements do "not provide conclusive information or certainty regarding the source of funds." (*Id.*). Colvard did not testify further regarding these wire's source(s).

In short, M&D's initial disclosures required the Court to hunt for clues across multiple pleadings and then guess the nature of the firm's fee agreement with the Debtors. M&D failed to investigate the source of the funds it received, despite knowing Pettit was credibly accused of using money held in trust for his own benefit. A reasonable lawyer who knew of these allegations and also knew his or her client primarily lived at Disney World, drove multiple luxury SUVs, and owned several multimillion-dollar homes would investigate; yet M&D took Pettit at his word until evidence came out proving M&D received money from the NM IOLTA. Nineteen days later, M&D's (late) Supplemental Affidavit of Disinterest still leaves unclear how many payments M&D received and fails to disclose the source of some of these payments. All these errors are on top of failure to disclose (until August 23) the payments for prepetition representation regarding the state court litigation. Any effort at disclosure M&D made was inadequate. For these reasons, the Court denies the Fee Applications and orders M&D disgorge to the Trustee any consideration received for representing the Debtors.

## II.  The Court Will Not Reach Other Issues.

The parties primarily raised two other issues in their moving papers: 1) the reasonableness and necessity of M&D's requested fees and 2) whether M&D's Rule 2014 disclosures were sufficient. The Court will not reach these issues. Questions concerning the reasonableness and necessity of M&D's requested fees are resolved by denying the Fee Applications for insufficient disclosure.

Rule 2014(a) requires debtor's counsel to file a verified statement (or affidavit) along with the attorney's employment application which sets forth counsel's connections with the debtor, creditors, any other party in interest, their respective attorneys and accountants, the UST, or any person employed by the UST. Fed. R. Bankr. P. 2014(a). Debtor's counsel has a continuing duty to supplement 2014(a) disclosures. *Id.* Rule 2014, and its companion section 327, do not explicitly provide for the remedies requested by the objecting parties. Fed. R. Bankr. P. 2014; 11 U.S.C. § 327. To the extent Rule 2014 is connected to the statutes at the heart of this disputes, issues regarding M&D's compliance with Rule 2014 are resolved by denying the Fee Applications.

### CONCLUSION

In conclusion, the Court finds that the appropriate remedy for M&D's pattern of nondisclosure in these cases is to deny the Fee Applications and disgorge any amounts paid to the Trustee for the benefit of the creditors. Denial and disgorgement may seem harsh, but public confidence in the bankruptcy system depends on forthright disclosure. This consequence is well documented across decades of case law throughout numerous jurisdictions. The Court's message to debtor's counsel is clear: disclose.

IT IS THEREFORE ORDERED that the First and Final Application for Compensation of Fees and Expenses of Martin & Drought, P.C. within the Chris Pettit & Associates, P.C. Chapter 11 Case (CP&A ECF No. 468) is DENIED.

IT IS FURTHER ORDERED that the First and Final Application for Compensation of Fees and Expenses of Martin & Drought, P.C. within the Christopher John Pettit Chapter 11 Case (CP ECF No. 91) is DENIED.

IT IS FURTHER ORDERED that all money or other consideration Martin & Drought, P.C. received for its representation of Debtors within one year of filing for bankruptcy is DISGORGED

to Eric Terry in his capacity as Chapter 11 Trustee to hold for the benefit of creditors. This includes payments not yet discovered or not yet brought to the attention of this Court. Disgorgement of money discussed in this Order shall occur within 30 days of entry of this Order. Disgorgement of any other compensation shall occur upon discovery or disclosure to this Court, whichever is earlier.

# # #